*No. 07-2173*

*Criminal*

_____

# In the

# UNITED STATES COURT OF APPEALS

# For the Eighth Circuit

_____

*UNITED STATES OF AMERICA,*

*APPELLEE,*

*v.*

*BRUCE W. BETCHER,*

*APPELLANT.*

_____

*Appeal from the United States District Court for the*

*District of Minnesota*

_____

*BRIEF OF APPELLEE*

_____

*RACHEL K. PAULOSE*
*United States Attorney*
*ERICA H. MACDONALD*
*Assistant U.S. Attorney*
*District of Minnesota*
*600 United States Courthouse*
*300 South Fourth Street*
*Minneapolis, MN  55415*
*(612) 664-5600*

*Attorneys for Appellee*

## SUMMARY OF THE CASE

Appellant Bruce W. Betcher was convicted in the District of Minnesota of (1) twenty-four counts of Production of Child Pornography, in violation of Title 18, United States Code, Section 2251(a) and (b); (2) one count of Receipt of Child Pornography, in violation of Title 18, United States Code, Section 2252(a)(2); and (3) one count of Possession of Child Pornography, in violation of Title 18, United States Code, Section 2252(a)(4)(B). Betcher appeals directly from the judgment of the district court which was based on the jury's verdict finding him guilty of each of these crimes.

Betcher raises four principal issues in this appeal. The issues are adequately addressed in the parties' briefs. If oral argument is scheduled, ten minutes per side should be sufficient.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE.. . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE ISSUES.. . . . . . . . . . . . . . . . . vi

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT.. . . . . . . . . . . . . . . . . 14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.    THIS COURT SHOULD REJECT BETCHER'S CONSTITUTIONAL ATTACK ON HIS CONVICTIONS BECAUSE HIS CONSTITUTIONAL ARGUMENT IS FORECLOSED BY THIS COURT'S PRECEDENT.. . . . . . . . . . . . . . . . 16

    II.   THE DISTRICT COURT DID NOT COMMIT AN ABUSE OF DISCRETION, LET ALONE REVERSIBLE ERROR, IN ADMITTING THE PHOTOGRAPHS AND VIDEO, THE VAST MAJORITY OF WHICH DID NOT CONTAIN CHILD PORNOGRAPHY, BECAUSE THE RULE 403 BALANCING TEST WEIGHED IN FAVOR OF INCLUSION.. . . . . . . . . . 21

    III. THE DISTRICT COURT DID NOT COMMIT AN ABUSE OF DISCRETION, LET ALONE REVERSIBLE ERROR, IN ADMITTING THE TESTIMONY OF DR. LEVITT BECAUSE THE TESTIMONY WAS LIMITED TO AREAS WITHIN HER EXPERTISE, THE TESTIMONY WAS HELPFUL TO THE JURY IN UNDERSTANDING THE EVIDENCE AND DETERMINING A FACT IN ISSUE, AND THERE WAS OVERWHELMING EVIDENCE OF BETCHER'S GUILT.. . . . . . . . . . . . . . . . . 34

    IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN SENTENCING BETCHER TO THE STATUTORY MAXIMUM TERM OF IMPRISONMENT ON EACH COUNT OF CONVICTION BECAUSE, AS THE DISTRICT COURT FOUND, THE SENTENCE IMPOSED WAS "IN ACCORD WITH JUSTICE, THE LAW, AND THE SENTENCING GUIDELINES.".. . . . . . . . . . . . . 40

Appellate Case: 07-2173   Page: 3   Date Filed: 12/14/2007 Entry ID: 3383125

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . 46

**TABLE OF AUTHORITIES**

PAGE

**CASES**:

Gall v. United States, 2007 WL 4292116,
    (S. Ct. Dec. 10, 2007).. . . . . . . . . . . . . . . . . 41

McKnight v. Johnson Controls, Inc.,
    36 F.3d 1396 (8th Cir. 1994).. . . . . . . . . . . . . . 23

Owsley v. Luebbers, 281 F.3d 687 (8th Cir. 2002). . . . . . . 17

United States v. Bausch, 140 F.3d 739 (8th Cir. 1998).. . . . 18-20

United States v. Becht, 267 F.3d 767 (8th Cir. 2001). . . . . 31

United States v. Bentley, 475 F. Supp. 2d 852,
    958 n.5 (N.D. Iowa 2007).. . . . . . . . . . . . . . . . 37

United States v. Bistrup,
    449 F.3d 873 (8th Cir. 2006).. . . . . . . . . . . . 34, 38,40

United States v. Booker, 543 U.S. 220 (2005). . . . . . . . . 18

United States v. Cannon, 475 F.3d 1013 (8th Cir. 2007). . . . 23

United States v. Ebbers, 458 F.3d 110 (2d Cir. 2006). . . . . 45

United States v. Hampton, 260 F.3d 832 (8th Cir. 2001). . . 18-20

United States v. Hoggard,
    254 F.3d 744 (8th Cir. 2001).. . . . . . . . . . . . 18, 19,21

United States v. Johns, 15 F.3d 740 (8th Cir. 1994).. . . . . 35

United States v. Kirkie, 261 F.3d 761 (8th Cir. 2001).. . 34, 35

United States v. Koenen, 230 Fed. App'x 631 (8th Cir. 2007).. 19

United States v. Lopez, 514 U.S. 549 (1995).. . . . . . . . 20, 21

Appellate Case: 07-2173     Page: 4     Date Filed: 12/14/2007 Entry ID: 3383125

United States v. McCourt, 468 F.3d 1088 (8th Cir. 2006).. . . . 31

United States v. Merino-Balderama,
        146 F.3d 758 (9th Cir. 1998).. . . . . . . . . . . . . . 33

United States v. Morrison, 529 U.S. 598 (2000). . . . . 19,20, 21

United States v. Mugan,
        394 F.3d 1016 (8th Cir. 2005). . . . . . . . . . . 16, 18,20

United States v. Mugan, 441 F.3d 622 (8th Cir. 2006). . . . . 19

United States v. Prior, 107 F.3d 654 (8th Cir. 1997). . . . . 17

United States v. Sanchez, Nos. 06-4193 and 07-1046,
        2007 WL 4192201, at *3 (8th Cir. Nov. 29, 2007). . . . . 41

United States v. Sewell, 457 F.3d 841 (8th Cir. 2006).. . . . 26

United States v. St. Pierre, 812 F.2d 417 (8th Cir. 1987).. . 35

United States v. Whitted, 11 F.3d 782 (8th Cir. 1993).. . . . 35

                                                              PAGE

**STATUTES:**

Title 18, United States Code, Section 2251. . . . . . . . . . . 1

Title 18, United States Code, Section 2251(a).. . . . 2, 16-18, 20

Title 18, United States Code, Section 2251(b).. . . . . 1, 16, 17

Title 18, United States Code, Section 2252(a)(4). . . . . . . 16

Title 18, United States Code, Section 2252(a)(4)(B).. . 2, 16, 21

Title 18, United States Code, Section 2252(a)(5)(B).. . . . . 18

Title 18, United States Code, Section 3553(a).. . . . . . 40, 41

Title 18, United States Code, Section2252(a)(2).. . . . . . 2, 16

Appellate Case: 07-2173    Page: 5    Date Filed: 12/14/2007 Entry ID: 3383125

**OTHER AUTHORITIES:**

Federal Rule of Evidence Rule 103(a)(1).. . . . . . . . . . .  23

Federal Rule of Evidence Rule 401.. . . . . . . . . . . . .  25

Federal Rule of Evidence Rule 52(a).. . . . . . . . . . . .  38

Federal Rules of Evidence Rule 403. . . . . . . . . .  21, 25, 26

Appellate Case: 07-2173    Page: 6    Date Filed: 12/14/2007 Entry ID: 3383125

# STATEMENT OF THE ISSUES

I. **WHETHER THIS COURT SHOULD REJECT BETCHER'S CONSTITUTIONAL ATTACK ON HIS CONVICTIONS FOR MANUFACTURING CHILD PORNOGRAPHY WHERE HIS CONSTITUTIONAL ARGUMENT IS FORECLOSED BY THIS COURT'S PRECEDENT?**

United States v. Koenen, 230 Fed. App'x 631 (8th Cir. 2007)

United States v. Mugan, 441 F.3d 622 (8th Cir. 2006)


II. **WHETHER THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN ADMITTING STILL PHOTOGRAPHS AND A VIDEO, THE VAST MAJORITY OF WHICH DID NOT CONTAIN CHILD PORNOGRAPHY, WHERE THE RULE 403 BALANCING TEST WEIGHED IN FAVOR OF INCLUSION?**

United States v. Becht, 267 F.3d 767 (8th Cir. 2001)

United States v. McCourt, 468 F.3d 1088 (8th Cir. 2006)


III. **WHETHER THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN ADMITTING THE TESTIMONY OF A CHILD ABUSE EXPERT WHERE THE TESTIMONY WAS LIMITED TO AREAS WITHIN HER EXPERTISE, THE TESTIMONY WAS HELPFUL TO THE JURY IN UNDERSTANDING THE EVIDENCE AND DETERMINING A FACT IN ISSUE, AND THERE WAS OVERWHELMING EVIDENCE OF BETCHER'S GUILT?**

United States v. Bistrup, 449 F.3d 873 (8th Cir. 2006)

United States v. Kirkie, 261 F.3d 761 (8th Cir. 2001)


IV. **WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION IN SENTENCING BETCHER WHERE, AS THE DISTRICT COURT FOUND, THE SENTENCE IMPOSED WAS "IN ACCORD WITH JUSTICE, THE LAW, AND THE SENTENCING GUIDELINES"?**

United States v. Sanchez, 2007 WL 4192201 (8th Cir. Nov. 29, 2007)

Appellate Case: 07-2173    Page: 7    Date Filed: 12/14/2007 Entry ID: 3383125

## STATEMENT OF THE CASE

In 2004, appellant Bruce W. Betcher took numerous pornographic and erotic pictures of his two young granddaughters and of three of their girlfriends. At the time the pictures were taken, the girls ranged in age from eight to eleven years old. In the pictures, the children are seen orally copulating each other, kissing each other (including each other's breasts), and engaging in the lewd and lascivious exhibition of their genitalia. Betcher was caught after law enforcement found the pictures on a computer in Georgia and subsequent investigation revealed that Betcher had been the one who had taken the photographs. Further investigation revealed that Betcher had additional images of child pornography on his personal computer, to include ninety-six pictures and sixteen videos.

On September 23, 2005, Betcher was charged by criminal complaint with one count of Production of Child Pornography, in violation of Title 18, United States Code, Section 2251. (Dkt.[1] #1.) Subsequently, a federal grand jury returned a twenty-six count indictment against Betcher. (Indictment at 1-12.) Counts 1 through 6, 13, and 14 charged Betcher with Production of Child Pornography, in violation of Title 18, United States Code, Section 2251(b). (Id. at 1-8.) Counts 7 through 12 and 15 through 24 charged Betcher with Production of Child Pornography, in violation

---

[1]"Dkt." refers to the Criminal Docket for this case as maintained by the United States District Court for the District of Minnesota.

1

of Title 18, United States Code, Section 2251(a). (Id. at 2-8.)
Count 25 charged Betcher with Receipt of Child Pornography, in
violation of Title 18, United States Code, Section 2252(a)(2).
(Id. at 8-9.) Finally, Count 26 charged Betcher with Possession of
Child Pornography, in violation of Title 18, United States Code,
Section 2252(a)(4)(B). (Id. at 9-10.)

On May 8, 2006, the case proceeded to a jury trial. (Trial
Tr.[2] at 1.) Among other evidence, the government presented the
testimony of the five child victims, all of whom identified Betcher
as having taken pornographic pictures of them. (Id. at 465-559.)
On May 12, 2006, the jury returned a verdict of guilty against
Betcher on all counts. (Dkt. #97.)

On May 7, 2007, Betcher appeared before the district court for
sentencing. (Sentencing Tr.[3] at 1.) Prior to sentencing, Betcher
filed a motion for downward departure, arguing that he had a low
risk of recidivism. (Id. at 80.) On this issue, the district
court heard the testimony of Dr. Mary Kenning, who evaluated
Betcher. (Id. at 6-78.) With her conclusions in mind, the
district court rejected the motion for downward departure. (Id. at
80-81.) The district court then calculated the Guidelines, finding

---

[2]"Trial Tr." refers to the Transcript of the Jury Trial held
before the Honorable James M. Rosenbaum.

[3]"Sentencing Tr." refers to the Transcript of the Proceedings
of the Sentencing/Evidentiary Hearing held before the Honorable
James M. Rosenbaum on May 7, 2007.

that Betcher's total adjusted offense level was 52, resulting in a Guidelines range of life imprisonment. (<u>Id.</u> at 85.) Recognizing that it could not impose a term of life imprisonment as called for by the applicable Guidelines range, the district court sentenced Betcher to the statutory maximum term of imprisonment on all counts of conviction, each term to run consecutive to one another. (<u>Id.</u> at 101-02.) In imposing this sentence, the district court stated: "I have imposed the sentence which is in accord with both justice, the law, and the sentencing guidelines." (<u>Id.</u> at 106.)

The district court filed its Judgment on May 10, 2007. (Document[4] #23.) On May 14, 2007, Betcher timely filed his Notice of Appeal, appealing both his convictions and his sentence. (Document #24.)

---

[4]"Document" refers to the document number in the designated record on appeal.

Appellate Case: 07-2173    Page: 10    Date Filed: 12/14/2007 Entry ID: 3383125

In 2004, Betcher lived in a three-story single-family home in Burnsville, Minnesota, with his wife and their three young grandchildren: (1) granddaughter K.B.O., born in 1993; (2) granddaughter K.O., born in 1995; and (3) grandson D.O., born in 1996. (Trial Tr. at 420-22, 426.) Although the children were technically his grandchildren, the Betchers had been awarded custody of the children in 1997 and the kids called him "dad." (Id. at 427, 502, 512.)

## I.    BETCHER TAKES PORNOGRAPHIC PICTURES OF FIVE YOUNG GIRLS.

The pornographic pictures that were the subject of Counts 1 through 24 of this case involved five young girls: (1) K.B.O.; (2) K.O.; (3) J.K.; (4) A.W.; and (5) M.K. (Id. at 324-34.) Betcher took pornographic photographs of these five young girls within the Betcher residence in 2004, when the girls' ages ranged from eight to eleven years old. (Id. at 323-24, 472-76, 505, 517, 530, 535-37.)

### A.    THE PICTURES INVOLVING K.B.O., J.K., AND A.W.

J.K. was born in 1993 and was K.B.O.'s best friend. (Id. at 526, 528.) A.W. was also born in 1993 and lived two doors down from K.B.O. (Id. at 543.) In 2004, K.B.O. regularly had J.K. and A.W. over to her house for sleepovers. (Id. at 158, 160, 428, 503, 515, 528, 543.) These sleepovers would occur almost every weekend. (Id. at 428-29, 503.) The girls would sleep in the basement of

4

the Betcher home, the room in which the majority of the pictures were taken. (Id. at 504, 516.)

It was during these sleepovers that Betcher took pornographic pictures of K.B.O., J.K., and A.W. (Id. at 517.) Betcher would tell the girls "how to stand and where to go." (Id. at 545.) Sometimes he would touch the girls while taking the photographs. (Id. at 536-37.) In the pictures, the children are seen orally copulating each other, kissing each other (including each other's breasts), and engaging in the lewd and lascivious exhibition of their genitalia. (Id. at 324-34; Gov't Exs. 1-78.)

## B. THE PICTURES INVOLVING K.O.

Sometimes eight-year-old K.O. would "get to hang out with the bigger kids" during the sleepovers. (Trial Tr. at 503.) Betcher took four pornographic photographs of K.O. when she was hanging out with the older girls during the sleepovers. (Id. at 324-34.) At trial, K.O. testified that her "dad" had taken pictures of her with her clothes off her body. (Id. at 505.)

## C. THE PICTURES INVOLVING M.K.

Like K.B.O, J.K., and A.W., M.K. was born in 1993. (Id. at 465.) M.K. met K.B.O. and K.O. in the summer of 2004 at Project Kids, which is a summer program for kids under the age of twelve years. (Id. at 467, 474, 480.) The three became friends and made plans for M.K. to come over to the Betcher home. (Id. at 474.)

5

In 2004, M.K. visited the Betcher house approximately three times and spent the night at that house one of those times. (Id. at 469-71.) Whenever M.K. was over at the Betcher home, Betcher "was always there" either "standing there or, nearby." (Id. at 470.) While she was over there, Betcher took "gross pictures" of her without her clothes on her body. (Id. at 472-73.) According to M.K., this is how the picture taking began:

> He asked me if I would like to take my clothes off and if he could take pictures of me. Naked, er, naked. And I thought it was like, who, what? Like, why are you asking me this, this is – it's not random, it's just kind of awkward, and I was like, no at first. And that was the first time when I went over, and he was like, oh, okay.

(Id. at 475.)

Although she said "no" at first, Betcher eventually did take pornographic pictures of M.K. (Id. at 475.) Betcher would "tell [M.K.] to go into different positions, or take pictures of [M.K.'s] private parts" either from a distance or close up. (Id. at 473.) One time, he touched her while he was trying to pose her into a position in which she had her legs spread. (Id. at 475.) M.K. is not sure how many times Betcher took naked pictures of her but she knows that it was more than one time. (Id. at 474.)

M.K. saw Betcher load the pornographic pictures on his computer. (Id. at 476.) After he loaded the pictures on his computer, M.K. saw the naked pictures of her on the computer screen. (Id.)

6

The first adult M.K. told about the pictures was Special Agent
Jessica Begres, who worked for Immigration and Customs Enforcement
("ICE") and was the case agent in this case.  (Id. at 311, 349,
477.)  When asked why she never told anyone before Special Agent
Begres, M.K. explained:

> I was scared.  I felt ashamed of what I did.  And I
> didn't want to tell my parents because I didn't want – I
> didn't want 'em to feel ashamed of me.  And I knew I did
> something bad, really bad.  And I was afraid to tell
> anybody because I didn't know, you know, what he might do
> to them if somebody found out.  Or if they might get hurt
> or, you know, I just I was trying to – I didn't know what
> to do.  I just –

(Id. at 478.)

### D. BETCHER USED AN OLYMPUS CAMERA MANUFACTURED OUTSIDE THE UNITED STATES TO PRODUCE THE PORNOGRAPHIC PICTURES.

Betcher, who was a real estate appraiser, only used Olympus
digital cameras.  (Id. at 52, 62-63, 145-46, 155.)  Through
forensic examination, it was determined that all of the
pornographic images produced by Betcher had been manufactured by an
Olympus digital camera with one of three model numbers:  X250,
D560, or C350.  (Id. at 259-60.)  There are no Olympus cameras
manufactured in the State of Minnesota or even in the United
States.  (Id. at 225-26.)  Government's Exhibit 130, an Olympus
D560 digital camera, which was one of Betcher's Olympus digital
cameras and which "matches identically to the information . . .
retrieved from each individual picture," was manufactured in
Indonesia.  (Id. at 177-78, 226, 261.)

7

## II.  THE SEVENTY-EIGHT PORNOGRAPHIC PICTURES ARE FOUND ON A LAPTOP COMPUTER IN GEORGIA.

On August 18, 2005, law enforcement officers searched the residence of a D.A.R.E. school officer in Carrolton, Georgia. (Id. at 232-33, 264.)  Among other items, the officers seized a laptop computer. (Id. at 232.)  On the laptop computer, law enforcement officers found several thousand images and videos containing child pornography. (Id. at 236.)

Special Agent Ben Murray, a forensic specialist with the United States Secret Service, sent the images of child pornography found on the laptop to the National Center for Missing and Exploited Children ("NCMEC"). (Id. at 228, 236.)  NCMEC maintains a central repository of child pornography which it uses to identify the victims of child pornography and to aid law enforcement in their investigation into these crimes. (Id. at 236, 313.)

Of the thousands of images Special Agent Murray sent, NCMEC was unable to identify seventy-eight of those images. (Id. at 236.)  In other words, NCMEC had not previously seen these seventy-eight images. (Id. at 236-37, 313.)  These seventy-eight images pictured the same five young victims and appeared to have been taken primarily in the basement of a home. (Id. at 324-34, 349; Gov't Exs. 1-78.)  NCMEC named this series of seventy-eight pictures "The Basement Girls" series. (Id. at 349.)  Based on items seen in the photographs, such as a partial picture of a

8

Brownie uniform, NCMEC believed that The Basement Girls series had been manufactured in the Minneapolis area.  (Id. at 47, 313.)

### III.  THE INVESTIGATION INTO THE GIRLS' IDENTITIES LEADS TO BETCHER.

On September 14, 2005, Special Agent Begres learned of the seventy-eight unidentified images.  (Id. at 313.)  Special Agent Begres, along with other members of the Minnesota Internet Crimes Against Children Task Force ("ICAC"), took on the task of attempting to identify the children depicted in the pictures.  (Id. at 46.)  Detective Steve Adrian, a nineteen-year veteran of the Burnsville Police Department, worked with Special Agent Begres on this task.  (Id. at 45.)

On September 15, 2005, members of ICAC met with ICE agents in the St. Paul office for a briefing and to receive assignments related to the investigation into the victims' identities.  (Id.) The agents and officers were split into teams of two and assigned to interview Brownie troop leaders within the Twin Cities area. (Id. at 47.)  The plan was to show the troop leaders cropped images of the children to identify who the children were and where the photographs had been taken.  (Id.)

On September 16, 2005, K.B.O. was identified as one of the five young girls pictured in the seventy-eight images.  (Id. at 48.)  Three days later, she was interviewed at her school.  (Id. at 48-49.)  Immediately after and based on the interview of K.B.O.,

9

Detective Adrian obtained a search warrant for the Betcher residence, the Betcher cars, and Betcher himself. (Id. at 52.)

On September 19, 2005, Detective Adrian and other law enforcement officers executed the search warrant at the Betcher residence. (Id. at 51-53.) Officers seized multiple items of evidence during the search, including three computers, several discs, an Olympus digital camera, and a web camera. (Id. at 132-38, 346-47.) In the area surrounding Betcher's computer, officers found an e-mail printout containing thumbnail pictures of child pornography. (Id. at 122.)

While other officers executed the search warrant, Detective Adrian interviewed Betcher. (Id. at 54.) During the course of the interview, in addition to other admissions, Betcher admitted to having a preference for child pornography of prepubescent girls and to receiving and possessing child pornography on his personal computer. (Id. at 70-71, 108, 347; Gov't Ex. 79.)

After interviewing Betcher, Detective Adrian and the officers concluded the search and left the residence. (Id. at 55.) After the execution of the search warrant, Detective Adrian was able to identify the remaining victims: K.O., J.K., A.W., and M.K. (Id. at 56.)

## IV. LAW ENFORCEMENT OFFICERS FIND CHILD PORNOGRAPHY ON BETCHER'S PERSONAL COMPUTER ALONG WITH OTHER INCRIMINATING INFORMATION.

Detective Coreen Kulvich of the Dakota County Sheriff's Department conducted the forensic examination of the computers

10

seized from Betcher's home. (Id. at 266, 275.) On Betcher's personal computer, which only he used, Detective Kulvich found ninety-six still images and sixteen videos containing child pornography. (Id. at 150-52, 275, 430.) These images and videos were completely different from the images and videos found in Georgia. (Id.) The e-mail printout of child pornography found next to Betcher's personal computer contained thumbnail photos from each of the sixteen child pornography videos along with the passwords needed to access the videos. (Id. at 287.)

None of the seventy-eight images found in Georgia were found on any of Betcher's computers. (Id. at 275-76.) On Betcher's personal computer, however, Detective Kulvich found non-pornographic images of the five child victims. (Id. at 276.) These images were taken on the same day and with the same equipment as the pornographic pictures. (Id.)

Detective Kulvich was also able to examine the computer to determine with whom the computer had been communicating. (Id. at 284.) From her examination, Detective Kulvich determined that Betcher's computer, using his Yahoo profile of Warren 19542000, had been communicating with the profile of Chelsea2300, which was the D.A.R.E. officer's Yahoo profile. (Id.) Specifically, between March 7, 2004 and March 5, 2005, Warren 19542000 (Betcher's middle name is Warren and year of birth is 1954) had communicated with Chelsea2300 on at least sixty-eight occasions. (Id. at 212, 284,

11

422.)  There was also evidence of e-mail communications between Betcher's e-mail account (BWB.betcher@comcast.net) and the D.A.R.E. officer's e-mail account (Chelsea2300@Yahoo.com). (Id. at 211, 285.)  This was important because, through his forensic examination, Special Agent Murray had determined that the seventy-eight images found on the D.A.R.E. officer's laptop computer had been received over the Internet under the Yahoo profile Chelsea2300.  (Id. at 238-39, 254.)

ICE Special Agent Kevin Lang examined a computer belonging to Betcher that was not present during the execution of the search warrant because it had been sent out for repair.  (Id. at 317, 388, 399-400.)  Special Agent Lang recovered two video files from the computer's hard drive.  (Id. at 402.)  Both of the videos were created on October 1, 2004, with one being created at 10:50 p.m. and the other at 11:08 p.m.  (Id. at 403.)  The first video is a close up of K.B.O. talking into a web camera at the direction of Betcher.  (Gov't Ex. 169.)  The second video depicts both Betcher and K.B.O. while both are working on a computer in the house.  (Id. at 407; Gov't Ex. 170.)

## V.  BETCHER ADMITS TO HIS BEST FRIEND THAT HE HAD TAKEN THE PICTURES.

After the execution of the search warrant, Betcher spoke with his best friend Blaine Shold.  (Id. at 167, 424.)  Betcher talked with Shold about how the pictures had been found.  (Id.)  Shold told Betcher to "be honest" and told him to "answer me one thing

12

honestly." (Id. at 168.) He then asked Betcher: "[D]id you take those pictures?" (Id.) Shold expected that the answer would be "no." (Id.) To his amazement and disappointment, Betcher bowed his head and replied: "Yes." (Id. at 168, 216-17.)

Even though Betcher had admitted these criminal acts, Shold stood by his best friend. (Id. at 170.) He stayed in contact with Betcher on a weekly basis up until the time of trial. (Id. at 169-70.) While in custody, Betcher had a telephone conversation with Shold in which Betcher admitted taking some of the photographs but contended that the young girls had taken the majority in a bad case of "Underage Girls Gone Wild." (Id. at 172-76; Gov't Ex. 131, 206.) He also had a telephone conversation with Shold in which he expressed his anger at Shold for turning the camera over to law enforcement (Gov't Ex. 130) because it was the camera used to take the pictures and discussed how the evidence should have been destroyed. (Id. at 180-81; Gov't Ex. 166.)

13

## SUMMARY OF THE ARGUMENT

This Court should reject Betcher's constitutional attack on his convictions for production of child pornography because Betcher's constitutional argument is foreclosed by this Court's precedent. There are two independent constitutionally permissible bases for federal jurisdiction in this case. First, the images were manufactured using a camera that had traveled in interstate or foreign commerce. Second, the images themselves actually traveled in interstate commerce. Accordingly, Betcher's convictions for production of child pornography are constitutional.

The district court did not commit an abuse of discretion, let alone reversible error, in admitting the forty-nine uncharged photographs or the video of K.B.O. and Betcher in the computer room. First, the vast majority of the evidence to which Betcher objects did not contain child pornography. Second, the Rule 403 balancing test weighed in favor of inclusion as the probative value of this evidence was high, the potential prejudicial impact was low and limited by the district court's and government's actions, and there were no evidentiary alternatives.

The district court did not abuse its discretion in admitting the testimony of child abuse expert Dr. Carolyn Levitt. Dr. Levitt testified generally regarding issues related to child abuse victims, including issues surrounding disclosure and age appropriate sexual knowledge and behavior. This Court has held on

14

multiple occasions that the admission of such testimony does not constitute an abuse of discretion. Moreover, assuming error, any error was harmless given the limited testimony of Dr. Levitt and the overwhelming evidence of Betcher's guilt.

The district court committed no error, let alone an abuse of discretion, in sentencing Betcher. The record before this Court shows that the district court was fully aware of the role of the Sentencing Guidelines and was cognizant of its duty to impose a reasonable sentence. The district court gave careful consideration to all of the relevant § 3553(a) factors, including the seriousness of the offense and the reasons for imposing a term of imprisonment. The district court then imposed a sentence within the applicable Guidelines range, finding that such a sentence is "absolutely valid" in this case. In so doing, the district court did not commit an abuse of discretion.

15

**ARGUMENT**

## I. THIS COURT SHOULD REJECT BETCHER'S CONSTITUTIONAL ATTACK ON HIS CONVICTIONS BECAUSE HIS CONSTITUTIONAL ARGUMENT IS FORECLOSED BY THIS COURT'S PRECEDENT.

Betcher was convicted of four different types of child pornography violations: (1) Production of Child Pornography in violation of § 2251(a); (2) Production of Child Pornography in violation of § 2251(b); (3) Receipt of Child Pornography in violation of § 2252(a)(2); and (4) Possession of Child Pornography in violation of § 2252(a)(4)(B). Betcher does not mount a constitutional attack on his convictions for either Receipt or Possession of Child Pornography; rather, Betcher only mounts a constitutional attack on his convictions for Production of Child Pornography. (Appellant Br. at 9, 12.) For the following reasons, this Court should reject Betcher's constitutional attack on the convictions.[5]

### A. **Standard of Review**.

This Court will review a challenge to the constitutionality of a statute de novo. United States v. Mugan, 304 F.3d 1016, 1021 (8th Cir. 2005). That being said, "[i]t is a cardinal rule in [this] Circuit that one panel is bound by the decision of a prior

_____

[5]Although Betcher's brief only addresses § 2251(b), his arguments apply equally to § 2251(a), which contains identical language with respect to the jurisdictional element. (Appellant Br. at 9, 12.)

16

panel." <u>Owsley v. Luebbers</u>, 281 F.3d 687, 690 (8th Cir. 2002) (citing <u>United States v. Prior</u>, 107 F.3d 654, 660 (8th Cir. 1997)).

**B.** **Betcher's Argument that the Statutes Prohibiting the Production of Child Pornography Are Unconstitutional Is Foreclosed by This Court's Precedent.**

Betcher attacks the constitutionality of the statutes prohibiting the production of child pornography, arguing that Congress does not have the power under the Commerce Clause to regulate the production of child pornography when "the only interstate event is that materials used, in this case a camera, crossed state lines at some point in their existence." (Appellant Br. at 7.) This Court should reject Betcher's argument.

As a preliminary matter, the United States notes that Betcher is wrong in arguing that the only basis for federal jurisdiction was that the camera used to take the pictures traveled in interstate commerce and that "the charges and record contains no indication that the manufactured images were disseminated across state lines." (Appellant Br. at 15.) Counts 1 through 24 each charge two independent bases for federal jurisdiction. Not only does each count charge that the pictures were manufactured using a camera that had traveled in interstate or foreign commerce, each count charges that the pornographic pictures actually traveled in interstate commerce, which is an independent basis for federal jurisdiction. <u>See</u> 18 U.S.C. § 2251 (a) and (b) (providing three independent bases for federal jurisdiction, one of which is "if

17

such visual depiction has actually been transported in interstate or foreign commerce"). This basis for federal jurisdiction was satisfied by the testimony of Special Agent Murray who testified that the pornographic photographs were found on a computer in Georgia and that his investigation determined that the photographs had been received over the Internet. (Trial Tr. at 228-313.)

More importantly, however, more than one panel of this Court has already rejected this precise constitutional attack. <u>United States v. Mugan</u>, 394 F.3d 1016, 1020-24 (8th Cir. 2006); <u>United States v. Hampton</u>, 260 F.3d 832, 834-35 (8th Cir. 2001); <u>United States v. Hoggard</u>, 254 F.3d 744, 746 (8th Cir. 2001); <u>United States v. Bausch</u>, 140 F.3d 739, 740-41 (8th Cir. 1998). For example, in <u>Mugan</u>,[6] the defendant used a digital camera to take child pornography pictures, which he then stored on a digital memory card that had been previously shipped in interstate or foreign commerce. <u>Mugan</u>, 394 F.3d at 1019. The defendant was charged with a violation of § 2251(a) and § 2252(a)(5)(B). This Court rejected the defendant's attack on the constitutionality of the federal child pornography statutes, finding that the statutes are constitutional because each contains an express jurisdictional element requiring the government to prove a concrete connection with interstate commerce. <u>Id.</u> at 1021. This Court also determined

---

[6]The <u>Mugan</u> judgment was vacated in light of <u>United States v. Booker</u>, but the discussion concerning the constitutionality of the child pornography statutes is nonetheless persuasive.

18

that a detailed application of the <u>Morrison</u> factors supports a finding that the statutes are constitutional "[g]iven the congressional findings about the nationwide child pornography market and its dependence upon locally produced materials for both supply and demand." <u>Id.</u> at 1024.

Although not precedent, this Court's opinion in <u>Koenen</u> is important on this issue. <u>United States v. Koenen</u>, 230 Fed. App'x 631 (8th Cir. 2007). In <u>Koenen</u>, the defendant pled guilty to production of child pornography, admitting that the camera he used to manufacture the child pornography had been mailed, shipped, or transported in interstate or foreign commerce. <u>Id.</u> at 631. On appeal, the defendant challenged the constitutionality of the production statute to which he had pled guilty. Rejecting the constitutional attack, the <u>Koenen</u> Court wrote:

> On appeal, he acknowledges that this court has on a number of occasions rejected claims similar to that which he raises in this appeal, namely, that the mere transportation across state or international lines of cameras used in the manufacture of child pornography does not constitute an impact upon interstate commerce sufficient to form a jurisdictional basis upon which Congress could validly prohibit the charged conduct under its Commerce Clause powers. <u>United States v. Mugan</u>, 441 F.3d 622 (8th Cir. 2006); <u>United States v. Hampton</u>, 260 F.3d 832 (8th Cir. 2001); <u>United States v. Hoggard</u>, 254 F.3d 744 (8th Cir. 2001); <u>United States v. Bausch</u>, 140 F.3d 739 (8th Cir. 1998). Notwithstanding the fact that this panel of the court is bound by those decisions, . . . Koenen argues that the district court failed to conduct the case-specific analysis that he argues is required by our holding in <u>Bausch</u>. We reject this argument, for as pointed out by the government, Koenen's admission that the camera he used to produce the child pornography had traveled in interstate commerce is by

19

itself sufficient to satisfy the analysis required by
<u>Bausch</u>.

<u>Id.</u>

In this case, there were two independent bases for federal
jurisdiction which were charged in the indictment and proven to the
jury. The first is, as discussed, that the pictures themselves
actually traveled in interstate commerce when they were transported
over the Internet to the computer in Georgia. (Trial Tr. at 228-
313.) The second is that the Olympus digital camera used to
manufacture the pictures was manufactured outside the State of
Minnesota and, sometime after its manufacture, traveled in
interstate or foreign commerce into the State of Minnesota. (<u>Id.</u>
at 177-78, 225-26, 259-260.)

Betcher acknowledges that this Court's precedent is contrary
to his position. (Appellant Br. at 9, 16.) He asks this Court,
however, to reexamine its precedent, arguing this Court's precedent
is "inconsistent with Supreme Court precedent, which therefore
controls." (<u>Id.</u> at 9.) The two Supreme Court cases upon which
Betcher relies are <u>United States v. Lopez</u>, 514 U.S. 549 (1995), and
<u>United States v. Morrison</u>, 529 U.S. 598 (2000). The problem with
Betcher's argument is that this Court has already rejected this
precise argument in multiple cases. <u>See, e.g.</u>, <u>Mugan</u>, 394 F.3d at
1021-24 (distinguishing the child pornography statutes from
statutes deemed unconstitutional in <u>Lopez</u> and <u>Morrison</u>); <u>Hampton</u>,
260 F.3d at 834 (rejecting <u>Lopez</u> challenge to § 2251(a) and

20

§ 2252(a)(4)(B)); Hoggard, 254 F.3d at 746 (rejecting Commerce Clause challenge to § 2251(b) and distinguishing § 2251(b) from the statutes involved in Lopez and Morrison).

In sum, this Court's precedent makes it clear that the statutes prohibiting the production of child pornography are constitutional. These statutes have an express jurisdictional element. The jurisdictional element was charged and then proven to the jury in two ways: the interstate travel of the pictures and the interstate and foreign travel of the camera used to take the pictures. Betcher's attack on the constitutionality of his convictions is foreclosed by this Court's precedent and, thus, his attack should be rejected.

## II. THE DISTRICT COURT DID NOT COMMIT AN ABUSE OF DISCRETION, LET ALONE REVERSIBLE ERROR, IN ADMITTING THE PHOTOGRAPHS AND VIDEO, THE VAST MAJORITY OF WHICH DID NOT CONTAIN CHILD PORNOGRAPHY, BECAUSE THE RULE 403 BALANCING TEST WEIGHED IN FAVOR OF INCLUSION.

Betcher argues that the district court abused its discretion in admitting "photographs and a video showing child pornography." (Appellant Br. at 18.) Specifically, Betcher argues that, pursuant to Federal Rule of Evidence 403, the district court should have excluded (1) those of the seventy-eight photographs that were not charged in the indictment and (2) a video.

The district court did not err in admitting this evidence, the vast majority of which did not contain child pornography. The disputed evidence is inextricably intertwined with the charges, its

21

high probative value as to the issue of who manufactured, and who is pictured in, the pornographic photographs substantially outweighed any potential prejudice, and there was no evidentiary alternative of equal or greater probative value. Each of these points is addressed in turn.

A.   **Standard of Review**.

In his brief, Betcher lumps this evidence together, arguing that he "objected to the twenty-six images and the video that were not part of the indictment on the grounds that they were prejudicial and cumulative." (Appellant Br. at 21.) The government agrees that Betcher made a timely objection to the admissibility of the video; however, Betcher did not make a timely objection to the admissibility of the photographs.

**1.   Betcher made a timely objection to the admissibility of the video; accordingly, the district court's decision to admit that evidence is reviewed for abuse of discretion.**

With respect to the video to which Betcher claims error, which is Government Exhibit 170,[7] defense counsel did make a timely objection as to its admission. (Trial Tr. at 407.) Accordingly, this Court will review the district court's decision to admit the video for an abuse of discretion, reversing "only when an improper

_____

[7]Betcher argues that the district court erred in admitting "a video showing child pornography." (Appellant Br. at 18.) Although there was far more than one video received into evidence, it is apparent from his brief that Betcher claims error as to the admissibility of Government Exhibit 170.

Appellate Case: 07-2173     Page: 29     Date Filed: 12/14/2007 Entry ID: 3383125

evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." <u>United States v. Cannon</u>, 475 F.3d 1013, 1023 (8th Cir. 2007).

> **2. Betcher did not make a timely objection to the admissibility of the uncharged photographs; accordingly, this claim is not preserved for review.**

Federal Rule of Evidence 103(a)(1) requires objections to the admission of evidence to be "timely." Fed. R. Evid. 103(a)(1); <u>McKnight v. Johnson Controls, Inc.</u>, 36 F.3d 1396, 1408 (8th Cir. 1994). "The rule is well settled in this circuit that for an objection to be timely it must be made at the earliest possible opportunity after the ground of objection becomes apparent, or it will be considered waived." <u>Id.</u>

The government offered the seventy-eight photographs through Special Agent Murray. (Trial Tr. at 242-43.) Prior to their admission, defense counsel took the opportunity to voir dire Special Agent Murray, asking questions regarding the photographs. (<u>Id.</u> at 243-44.) After so doing, defense counsel stated: "I have no objection to the photographs, Your Honor." (<u>Id.</u> at 244.) The district court then admitted the photographs. (<u>Id.</u>) After the photographs were admitted, the prosecution questioned Special Agent Murray regarding the seventy-eight photographs. (<u>Id.</u> at 244-48.)

After the photographs were admitted and Special Agent Murray had been questioned on them but before the end of the direct examination of Special Agent Murray and before the jury had seen

23

the seventy-eight photographs, the district court took a recess for approximately fifteen minutes. (Id. at 248.) After the recess, the defense attorney advised the district court that the defense had made a mistake. (Id. at 250.) Defense counsel then objected to the admission of the pictures that were not charged in the indictment. (Id. at 251.) The government argued that the pictures were "inextricably intertwined" with the charges, noting that the pictures were taken of all the same children, on the same dates, by the same camera and were received by the same computer in Georgia. (Id. at 251-52.) The district court agreed with the government and overruled the defense objection. (Id. at 252.)

As the foregoing demonstrates, defense counsel's belated objection to the photographs was not timely. These seventy-eight photographs were not a surprise, and the charges were well known before the government moved for the photographs' admission. Accordingly, this claim has not been preserved for appellate review. Even if this Court were to review the claim, however, it would find that the district court committed no error in admitting the photographs.

**B.** **The Video and Forty-Seven of the Forty-Nine Uncharged Photographs Did Not Contain Child Pornography.**

As a preliminary matter, the government notes that all of these exhibits contained child pornography and, thus, Betcher overstates the potential prejudicial impact of this evidence. The video not only did not contain child pornography – it did not even

24

contain nudity.[8]  Of the forty-nine still images which were not
charged in the indictment,[9] only two arguably contain child
pornography.  (See Gov't Exs. 43 and 63.)  Each of those two
photographs depicts a close-up view of a vaginal area being held
open with two hands. (Id.)  Other than those two still photographs,
none of the other forty-nine uncharged images contained child
pornography.[10]

**C.**   **The District Court Did Not Err in Admitting the Video and the Photographs Because the Rule 403 Balancing Test Weighed in Favor of Admission**.

Betcher argues that the district court erred in admitting the
video and photographs.  Betcher does not argue that the evidence
was inadmissible under Rule 401; rather, Betcher argues that it
should have been excluded under Rule 403 as unfairly prejudicial.
(Appellant Br. at 19-22.)

---

[8]The video is a 33-second video of Betcher and K.B.O. in the computer room, both sitting at separate stations.  Betcher adjusts a web camera to focus on K.B.O.  K.B.O. is dressed in a long t-shirt and underwear.  Betcher reaches toward her inner thigh at which time K.B.O. pushes his hand away and says "Quit."  He then says "I was videotaping" and "We'll try to send it shortly." Although this is powerful relevant evidence, there is no child pornography in the video.  (Gov't Ex. 170.)

[9]Twenty-nine of the seventy-eight photographs were charged in the indictment and forty-nine were not.

[10]This case presents the difficult issue of how to present highly sensitive evidence for the Court's review.  The government considered several alternatives of how to present these exhibits to the Court.  Ultimately, counsel for the government decided not to attempt to file these exhibits with the Court but to make them available for the Court's review at its request and in whatever manner it dictates.

Appellate Case: 07-2173    Page: 32    Date Filed: 12/14/2007 Entry ID: 3383125

Federal Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. In conducting the Rule 403 balancing test, "the district court should discount the probative value of the disputed evidence if an evidentiary alternative has equal or greater probative value and poses a lower risk of unfair prejudice." United States v. Sewell, 457 F.3d 841, 843 (8th Cir. 2006).

   1. **The probative value of the evidence was extremely high on the issue of who manufactured, and who was pictured in, the pornographic pictures.**

In this case, as to Counts 1 through 24, the paramount issue for the jury to decide was who manufactured the pornographic images. Betcher's primary defense was that the girls took the pictures and e-mailed them to Chelsea2300 in Georgia. This defense was advanced through the defense opening statement, the cross-examination of the government's witnesses, and the defense closing argument. Government Exhibits 1 through 78 and 170 were highly probative on the issue of who manufactured the pornographic photographs.

Government Exhibit 170 is the video of K.B.O. and Betcher in the computer room. The video is highly probative because it shows Betcher filming K.B.O. with a separate web camera and stating that he would send the videotape shortly. This evidence helps to prove that Betcher is the one who manufactured and distributed the

Appellate Case: 07-2173    Page: 33    Date Filed: 12/14/2007 Entry ID: 3383125

charged photographs to Chelsea2300 just as he is the one who was videotaping K.B.O. and attempting to send that video using his computer.

The probative value of the seventy-eight photographs as a whole on the issue of who manufactured the pornographic pictures was also extremely high. The evidence conclusively established that all of the seventy-eight photographs were taken of the same children, on the same fifteen dates, by the same model of camera, and in the same home. The evidence further conclusively established that all of these seventy-eight photographs were received over the Internet by the same computer in Georgia under the Yahoo profile of Chelsea230 – a profile with which Warren19542000 (Betcher's profile) had extensive contact in the relevant time period. The entirety of the series viewed as a whole proved beyond a reasonable doubt that the pictures were manufactured in Betcher's home by Betcher.

From the metadata, it was determined that the seventy-eight photographs were taken on fifteen different dates. The photographs taken on each day, when grouped together as a whole, provide a complete evidentiary picture as to which of the girls were involved in the photo session on that particular day. The photographs were therefore probative evidence on their own and they helped corroborate the testimony of the five girls regarding Betcher's involvement. In each of those fifteen groups of photographs, there

27

was always a picture of all of the girls involved on that day together, indicating that someone else was present and taking the photographs – that someone else being Betcher. Many of the photographs depicting all of the girls were not charged in the indictment because they did not constitute child pornography. (E.g., Gov't Exs. 7, 8, 19, 38, 39, 48, 49, 53 and 62.)

In addition to who manufactured the photographs, an element which the jury had to find beyond a reasonable doubt in order to convict was that the picture was of an identifiable minor under the age of 18 years. (Trial Tr. at 680-84.) The uncharged photographs were highly probative in establishing what would have otherwise been an unidentifiable body part in a pornographic picture. Several of the charged photographs contain extreme close-up views of female genitalia. (Gov't Exs. 13, 22, 30, 33, 34, 40, and 55.) Without the uncharged photographs, it would be extremely difficult if not impossible to conclude that the photograph was of an identifiable minor under the age of 18. It is through the uncharged pictures that one can tell who is pictured in those extreme close-up pornographic pictures.

The series of seven photographs (Gov't Exs. 53-5) taken on October 9, 2004 is a good example of these arguments. Only two of these photographs, Government Exhibits 55 and 59, were charged in the indictment because they are the only ones of this series that contained child pornography. Government Exhibit 55 is an extreme

Appellate Case: 07-2173    Page: 35    Date Filed: 12/14/2007 Entry ID: 3383125

close-up picture of a prepubescent girls' genitalia with her multi-colored underwear pulled down on her thighs. (Gov't Ex. 55.) Government Exhibit 59 is a still photograph of a young girl performing oral sex on another young girl who is standing on her head with her legs spread. (Gov't Ex. 59.) If one were to look at only Exhibits 55 and 59, it would be difficult to determine who the children were pictured in the photograph, who was present in the room that day, and whether it was one of the girls or Betcher who manufactured those pornographic photographs. (Id.) It is the other five of the seven pictures in that series which provide the answers to those questions and corroborate the testimony of J.K. regarding what Betcher did that day. Through viewing the uncharged photographs with the charged photographs, one can see that Exhibit 55 if of J.K. because she is depicted in the uncharged photographs wearing the same distinctive multi-colored Power Puff Girl underwear. (Gov't Exs. 53 and 56.) Likewise, through viewing the uncharged photographs, one can see that the young girl standing on her head with her legs spread is J.K. (Gov't Exs. 57 and 58.) By viewing all seven of these photographs as a whole, one can further see that there were three girls involved in the photo session that day. (Gov't Exs. 53-59.) There are two uncharged photographs picturing all three girls together, which means there was someone else there taking the pictures. (Gov't Exs. 53 and 56.) Government Exhibit 54 is an uncharged photograph which shows an

29

adult male hand holding Monopoly money and touching the shoulder of a naked girl, who is only depicted from the chin down to the ribs. Only through viewing the entire series of photographs taken on that day can one positively see that the girl in Government Exhibit 54 is J.K, who testified the adult male hand in the picture was Betcher's, the individual who took the pornographic pictures. (Trial Tr. at 536.) As the government explained to the jury in closing argument:

> If you go through those, you will see which girls were in the basement that day. And what you will see with respect to those series is that there's always a photo where all the girls are pictured. And what does that tell you? That there was someone else there taking the pictures. And that someone else is the defendant.

(Id. at 645-46.)

The vast majority of the uncharged photographs were also highly probative of where the pictures were manufactured – Betcher's home, which was important in demonstrating who took the photographs. The pictures were primarily taken in the basement, but several of the photographs were taken in the bathroom, the office, and an upstairs bedroom. Many of those photographs were not charged in the indictment because they did not contain child pornography; however, the photographs themselves are highly probative of where all the photographs were manufactured – Betcher's house. (E.g., Gov't Exs. 2-3, 7-9, 16-18, 19-25, 27-28, 35-39, 40-49, 53, 56-58, 60-61, 65-67, 72-73, 75-76.) These uncharged photographs contain indisputable evidence linking all the

30

photographs to the Betcher home, such as the placement of an iron in the background of one photograph which was still there on the day of the search warrant. (Gov't Ex. 61.) It was the totality of the seventy-eight photographs which permitted the government to give the full evidentiary picture to the jury of where these photographs were taken.

In sum, the probative value of these photographs was high. The entirety of the seventy-eight photographs was necessary to give the jury the full picture of what occurred in the Betcher home, who is pictured in each of the photographs, where the photographs were manufactured, and who manufactured the photographs – Betcher. The photographs did so independently and by corroborating the testimony of the victim children.

### 2. The photographs were not unfairly prejudicial.

Rule 403 "does not offer protection against evidence that is merely prejudicial"; rather, the "rule protects against evidence that is unfairly prejudicial." <u>United States v. McCourt</u>, 468 F.3d 1088, 1092 (8th Cir. 2006). In the context of child pornography cases, the "the admission of still images of child pornography does not rise to the level of unfair prejudice." <u>United States v. Becht</u>, 267 F.3d 767, 774 (8th Cir. 2001).

In this case, the 33-second video was not unfairly prejudicial. As discussed, it did not contain child pornography or even child erotica. The video gave insight as to who in that house

31

was videotaping K.B.O. and attempting to send that videotape to someone else via the computer. Betcher's attempt to touch K.B.O. inappropriately shown on the video is inextricable intertwined with this evidence and independently admissible to show Betcher' intent, knowledge, and lack of mistake. Fed. R. Evid. 404(b).

Likewise, the forty-nine uncharged still images were not unfairly prejudicial. Forty-seven of the forty-nine uncharged images did not contain child pornography. To be sure, the vast majority of the uncharged pictures contained child erotica; however, the uncharged photographs were far less prejudicial than the charged photographs, to which Betcher does not object.

Betcher argues that the "prejudicial effect of the non-charged . . . images and the video was high" because of their "graphic nature." (Appellant Br. at 22.) The uncharged photographs, however, did not contain "graphic" material. It was the charged photographs, of which Betcher does not complain, that contained the graphic material.

The government and the district court also took pains to limit the prejudicial impact of evidence in this case. The district court and the government both warned the jury about the nature of the evidence in this case. The district court followed an exacting voir dire, individually questioning jurors about previous encounters with child sexual abuse and striking those prospective jurors who did not believe they could be fair based on the nature

32

of the case.  Likewise, in its opening statement, the government warned of the sensitive nature of the evidence.  (Trial Tr. at 11-12.)  The government did not publish all seventy-eight images to the jury; rather, the government only published a few of these images for a brief period.  Thus, any prejudicial effect of these pictures was lessened by the way in which the case was handled.

**3. There was no evidentiary alternative offered or available.**

There was no evidentiary alternative to the video or the forty-nine uncharged photographs.  Notably, the defendant did not offer to stipulate to any element of Counts 1 through 24.  This fact alone makes the Ninth Circuit case on which the defendant relies inapposite.  See United States v. Merino-Balderama, 146 F.3d 758, 762 (9th Cir. 1998).

Recognizing that there were no evidentiary alternatives, Betcher summarily argues that "evidentiary alternatives were not needed in this case."  (Appellant Br. at 22.)  He makes no effort to analyze the issue or the requisite elements of the crime.  Contrary to his position, the government had the burden of proving who manufactured these pictures and that the pictures were of an identifiable minor under the age of 18 years.  These items of evidence were highly probative on this issue and there was no alternative evidence which would provide such evidentiary value.

33

**III. THE DISTRICT COURT DID NOT COMMIT AN ABUSE OF DISCRETION, LET ALONE REVERSIBLE ERROR, IN ADMITTING THE TESTIMONY OF DR. LEVITT BECAUSE THE TESTIMONY WAS LIMITED TO AREAS WITHIN HER EXPERTISE, THE TESTIMONY WAS HELPFUL TO THE JURY IN UNDERSTANDING THE EVIDENCE AND DETERMINING A FACT IN ISSUE, AND THERE WAS OVERWHELMING EVIDENCE OF BETCHER'S GUILT.**

Betcher argues that the district court committed an abuse of discretion in admitting the testimony of Dr. Carolyn Levitt, an experienced and renowned pediatrician specializing in the area of child abuse. Betcher argues that Dr. Levitt's testimony was both irrelevant and prejudicial. The district court committed no abuse of discretion in admitting the testimony. Even if there were error, it was harmless because the testimony was extremely limited and the evidence of Betcher's guilt was overwhelming.

**A.    Standard of Review.**

This Court will review a trial court's decision to allow expert testimony for an abuse of discretion. <u>United States v. Kirkie</u>, 261 F.3d 761, 765 (8th Cir. 2001). Even if expert testimony is erroneously admitted, a defendant is not entitled to a new trial if the error was harmless. <u>United States v. Bistrup</u>, 449 F.3d 873, 882 (8th Cir. 2006).

**B.    The District Court Did Not Err in Admitting the Testimony of Dr. Levitt Because Her Testimony Was Limited to Issues Within Her Expertise and Aided the Jury in Understanding the Evidence and Determining a Fact in Issue.**

The district court permitted Dr. Levitt to testify pursuant to Federal Rule of Evidence 702. (Trial Tr. at 564.) Federal Rule of Evidence 702 permits the district court to admit the testimony of

34

a witness whose knowledge, skill, training, experience, or education will assist a trier of fact in understanding the evidence or determining a fact in issue. Kirkie, 261 F.3d at 765. In the context of child abuse cases, a qualified expert can inform the jury as to behavioral characteristics of sexually abused children in general. Id. at 766; United States v. Whitted, 11 F.3d 782, 785 (8th Cir. 1993); United States v. Johns, 15 F.3d 740 (8th Cir. 1994); United States v. St. Pierre, 812 F.2d 417 (8th Cir. 1987).

Dr. Levitt testified at the conclusion of the government's case. (Trial Tr. at 565.) After qualifying as an expert, a fact to which Betcher stipulated, Dr. Levitt testified based on her training and experience as to the behavioral characteristics of sexually abused children. (Id. at 571-72.) Specifically, she testified regarding the issue of disclosure, including delayed disclosure, partial disclosure, and refusal to disclose. (Id. at 572-76.) Dr. Levitt then testified about age appropriate sexual conduct or knowledge as it relates to children who have experienced some type of sexual abuse. (Id. at 577-81.) Dr. Levitt's testimony was well within the confines of this Circuit's established precedent, and the district court committed no abuse of discretion in admitting such testimony.

Betcher argues that the district court should have prohibited Dr. Levitt's testimony because it was not relevant. In fact, Dr. Levitt's testimony was highly relevant. The paramount issue for

35

the jury to decide was who took the pictures of the girls. (See Trial Tr. at 31 (defense counsel stated to the jury that the "issue is going to be to decide who actually took these photographs")). The defense in this case was that the girls themselves took the pictures and that their accounts regarding who manufactured the pictures had been inconsistent. This line of defense ran throughout the trial and was advanced during the defense opening statement, the cross-examination of government witnesses, and the defense closing argument. The issue as to disclosure and age appropriate sexual knowledge and conduct was helpful to understanding why the girls did not disclose the abuse but waited until confronted with the pictures, why K.B.O. initially denied any photographs being taken, and who was involved in the taking of photographs which included children under the age of twelve years performing oral sex on one another and a child under the age of twelve pictured with a screw in her vagina. In sum, the jury needed to be educated on these issues to determine who manufactured the photographs as guided by the children's testimony and the content of the photographs.

Betcher also summarily argues that Dr. Levitt's statement that child pornography is one form of child abuse, "was highly prejudicial given that Mr. Betcher was not charged with any crime related to child abuse." (Appellant Br. at 24.) In fact, Betcher was charged with a crime related to child abuse – he was charged

36

with manufacturing child pornography using children, including his granddaughters, under the age of twelve years.[11]

The purpose of Dr. Levitt's answer regarding child pornography being a form of child abuse was to put her testimony in context. Dr. Levitt's expertise is in the area of child sexual abuse, of which child pornography is one form. (Trial Tr. at 570.) Only by explaining this could the jury understand Dr. Levitt's testimony as it relates to the behavioral characteristics of sexually abused children. (Id. at 565-83.) Dr. Levitt's one answer, to which Betcher did not object or move to strike, therefore was not unduly prejudicial. (Id. at 570.)

In sum, Dr. Levitt's testimony was well within the confines of permissible expert testimony in this type of case. Her testimony was both relevant and admissible. The district court did not abuse its discretion in admitting this evidence and the district court did not commit plain error in not sua sponte striking Dr. Levitt's statement that child pornography is a form of child abuse.

---

[11]United States v. Bentley, 475 F. Supp. 2d 852, 958 n.5 (N.D. Iowa 2007) (explaining child pornography is one form of child abuse, which is evidenced by Congress' decision to define "offense of child molestation" for purposes of Federal Rule of Evidence 414 to include both acts of physical sexual abuse as well as child pornography).

Appellate Case: 07-2173    Page: 44    Date Filed: 12/14/2007 Entry ID: 3383125

**C.** **Any Error in Admitting Dr. Levitt's Was Harmless Because the Jury Was Well Aware of the Limits of Dr. Levitt's Testimony and There Was Overwhelming Evidence of Betcher's Guilt**.

Assuming arguendo that Dr. Levitt's testimony was erroneously admitted, Betcher is not entitled to a new trial because any error in admitting the testimony was harmless. Federal Rule of Evidence 52(a) provides that any error not affecting substantial rights should be disregarded. Fed. R. Evid. 52(a). "An error is harmless if it does not affect substantial rights of the defendant and did not influence or had only a slight influence on the verdict." Bistrup, 449 F.3d at 882 (quotations and citations omitted).

In this case, Dr. Levitt's testimony was limited. In opening statement, the government told the jury about the limited purpose of Dr. Levitt's testimony, which was to "illuminate for you issues surrounding disclosure, why a child may not disclose sexual abuse, of which child pornography is a subpart." (Trial Tr. at 27.) Likewise, defense counsel explained the limitations of Dr. Levitt's testimony, explaining that Dr. Levitt has not examined any of the child victims and that "she will talk in generalities, that she will tell you what normally happens in a given situation." (Id. at 39.) Dr. Levitt's direct examination spanned a total of 18 pages out of a 697-page trial transcript. (Id. at 566-83.) In closing arguments, the parties again addressed the limited nature of Dr. Levitt's testimony. Defense counsel emphasized Dr. Levitt's limited testimony and the fact that she had not examined any of the

38

children.  (Id. at 660.)  In rebuttal, the government explained: "[T]he purpose of Dr. Levitt's testimony was to help you understand how kids disclose abuse, what keeps them from disclosing abuse, and why they couldn't disclose."  (Id. at 665.)

While the testimony of Dr. Levitt was limited, the independent evidence of Betcher's guilt was overwhelming.  First and foremost, each of the five girls in this case came into open court, promised to tell the truth, and testified that Betcher had photographed them naked.  Each of the girls' testimony was corroborated by the other girls' testimony as well as other evidence.  Betcher himself admitted to his best friend Blaine Shold that he had taken the photographs.  Likewise, in a jail house call, Betcher told Shold that the girls had taken the majority of pictures, the obvious implication being that he had taken at least some of the pornographic pictures.  The computer forensics showed that Betcher had pictures on his computer which were taken of the same girls, on the same day, and by the same camera as the pornographic pictures. Likewise, computer forensics showed that Betcher's Yahoo profile, Warren19542000, had extensive computer communication with Chelsea2300 during the relevant time period.  In addition, Betcher himself, in his tape-recorded statement to law enforcement, admitted his preference for child pornography picturing prepubescent girls.  The evidence showed that he had this preference, that he bought child pornography in pursuit of that

39

preference, and that, consistent with that preference, he took the pornographic pictures of these five young girls. The evidence of his guilt was overwhelming; thus, any error in admitting the forty-nine uncharged still photographs and the video of K.B.O. and Betcher was harmless. Given the overwhelming evidence of guilt, any error in admitting Dr. Levitt's testimony was harmless. <u>See, e.g.</u>, <u>Bistrup</u>, 449 F.3d at 882 (finding harmless error in admission of expert testimony where there was overwhelming evidence of guilt).

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN SENTENCING BETCHER TO THE STATUTORY MAXIMUM TERM OF IMPRISONMENT ON EACH COUNT OF CONVICTION BECAUSE, AS THE DISTRICT COURT FOUND, THE SENTENCE IMPOSED WAS "IN ACCORD WITH JUSTICE, THE LAW, AND THE SENTENCING GUIDELINES."

Betcher appeals his sentence, arguing the district court abused its discretion in sentencing him to a term of life imprisonment.[12] Betcher does not argue that the district court erred in calculating the applicable Guidelines range; rather, Betcher argues that the district court "committed a clear error of judgment" in weighing the § 3553(a) factors. Contrary to Betcher's position, the district court committed no error, let alone an abuse of discretion.

_____

[12]The district court did not technically sentence Betcher to a term of life imprisonment. Recognizing that it could not sentence Betcher to a term of life imprisonment as called for by the Guidelines on any single count, the district court sentenced Betcher to the statutory maximum term of imprisonment on each count with, each term to run consecutive to one another. The total sentence was 750 years imprisonment. (Sentencing Tr. at 101-02.)

Appellate Case: 07-2173    Page: 47    Date Filed: 12/14/2007 Entry ID: 3383125

**A.** **Standard of Review**.

Whether a sentence is reasonable in light of § 3553(a) is reviewed for abuse of discretion. <u>Gall v. United States</u>, 2007 WL 4292116, (S. Ct. Dec. 10, 2007); <u>United States v. Sanchez</u>, Nos. 06-4193 and 07-1046, 2007 WL 4192201, at *3 (8th Cir. Nov. 29, 2007). A sentence within the Guidelines range is presumptively reasonable. <u>Id.</u> A sentencing court abuses its discretion if it fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the appropriate factors but commits a clear error of judgment in weighing those factors. <u>Id.</u>

**B.** **The District Court Appropriately Evaluated All of the Relevant Section 3553(a) Factors, Giving No Factor Too Little or Too Much Weight**.

The district court committed no error, let alone an abuse of discretion, in sentencing Betcher. To the contrary, the record before this Court shows that the district court knew exactly what its role was and sentenced Betcher in accordance.

First, the district court noted the correct role of the Guidelines in sentencing Betcher. Specifically, at sentencing, the district court explained that it was not bound by the Guidelines but it was called upon to calculate the Guidelines because such were "advisory." (Sentencing Tr. at 79.)

The district court then correctly calculated the applicable Guidelines range. In so doing, the district court determined that

41

Betcher's total adjusted offense level was 52, noting that "even the guidelines at their most adventurous doesn't go above 43." (Id. at 85.) With an offense level of 52 and criminal history category of I, the district court correctly determined that the applicable Guidelines range was life imprisonment. (Id.)

Having calculated the applicable Guidelines range, the district court explained its role: "I am required by law to try and impose a just sentence." (Id. at 101.) The district court noted there are several reasons for imposing a term of imprisonment, including deterrence, rehabilitation, and punishment. (Id. at 99.) The district court then noted one additional reason: "incapacitation" which "means that you put someone where they cannot do it again." (Id.) The district court then stated that it was "not sentencing Mr. Betcher to send a lesson or a message to anybody," explaining:

> I will sentence Mr. Betcher because of what Mr. Betcher did. What he did knowingly, what he did intentionally, what he did with a vicious kind of malice that would victimize someone who has no defense, an utterly unconscionable act.

(Id. at 101.) Recognizing that it could not impose a term of life imprisonment due to the statutory maximums, the district court sentenced Betcher to the statutory maximum term of imprisonment on each count of conviction, each term to run consecutive to one another. (Id. at 101-02.) After imposing sentence, the district court stated: "I have imposed the sentence which is in accord with

42

both justice, the law and the sentencing guidelines." (Id. at 106.)

Betcher argues that the "district court did not give appropriate weight to the unlikely probability that Mr. Betcher will commit future crimes." (Appellant Br. at 27.) As a preliminary matter, there is no evidence of an "unlikely probability" of recidivism – Betcher's own expert testified that he has a 39% chance of reoffending within seven years and a 59% chance of reoffending within ten years. (Sentencing Tr. at 78.) More importantly, the district court did consider Betcher's argument with respect to recidivism, finding that there is not "an insubstantial risk of reoffense" and even a "23-percent probability is a pretty high percentage probability." (Id. at 80.)

Betcher next argues that the "district court also did not give appropriate weight to the seriousness of Mr. Betcher's offense." (Appellant Br. at 28.) He contends that "[n]othing in this record supports the extraordinarily harsh sentence imposed by the district court." (Id.) Contrary to Betcher's position, the district court did consider the seriousness of Betcher's offense. On this issue, the court said:

> What I have here is a person who periodically, knowingly
> victimized children. Serious punishment for such a
> person is called for both by Congress, by the guidelines,
> and by any sense of reason, and any sense of justice.

(Sentencing Tr. at 81.) The district court further stated:

43

There are some cases that really test the limits of the criminal justice system. And there are some crimes for which there's just, there's no excuse. A person's hungry, they can steal. A person thinks they can't get a break, they can maybe hustle and make a living. A person does something stupid, those things happen. But when a person just victimizes someone else because they can, the justifications that normal people use don't fit. There are reasons that are programmed into healthy people. There's a certain respect and care for a woman who's pregnant. A willingness to help an older person who has a hard time walking. Why infants are taken care of. And why children are sheltered and nurtured. Because it goes to the fundament of how the species is to protect itself and regenerate itself. Somebody who victimizes a child flies in the face of what civilized humans do. There is something fundamentally hardwired, and when it's not hardwired, the deviance is intolerable in a society. And when that happens, we now have the compounding problem in this case of a perversion of science in the sense that we have created devices that can multiply, store, transmit, keep, and display these things, these photos, forever. That's intolerable. And the law and the guidelines will not tolerate it.

(Id. at 98-99.) These statements demonstrate the district court gave appropriate consideration to the seriousness of Betcher's crimes.

As a final point of error, Betcher argues that the district court did not "give appropriate weight to the Sentencing Guidelines policy statements." (Appellant Br. at 29.) Betcher goes on to argue, in essence, that the Sentencing Commission erred when it formulated the child pornography Guidelines because his resulting adjusted offense level was too high. (Id. at 29-32.) Betcher's argument should be rejected. The Sentencing Commission has carefully evaluated the appropriateness of the Guidelines, both the base offense level and the specific offense characteristics. The

44

Guidelines represent decades of close attention to sentencing policy and close to twenty years of careful consideration of the proper sentence for federal offenses. <u>See</u> <u>United States v. Ebbers</u>, 458 F.3d 110, 129 (2d Cir. 2006). The Guidelines reflect the extreme seriousness of this offense. The district court recognized as much when it stated that it was sentencing Betcher in accordance with the Guidelines which "in this case is absolutely valid." (Sentencing Tr. at 101.) The district court committed no error, let alone an abuse of discretion, in imposing a sentence within the Guidelines range.

In sum, the record reflects that the district court gave careful consideration to the sentence to be imposed. The record before this Court shows that the district court was cognizant of its duty to impose a reasonable sentence and that it imposed a sentence which it believed to be both just and reasonable. The district court did not abuse its discretion.

45

## CONCLUSION

For all the foregoing reasons, the judgment of the District Court should be affirmed.

## CERTIFICATE OF COMPLIANCE

The undersigned attorney for the United States certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief has 1181 lines of monospaced type. The brief was prepared using WordPerfect X3. The undersigned attorney also certifies that the computer diskette containing the full text of the Brief of Appellee has been scanned for viruses and to the best of our ability and technology, believes it is virus-free.

Dated: December 13, 2007

                                    Respectfully submitted,

                                    RACHEL K. PAULOSE
                                    United States Attorney

                                    BY: ERICA H. MACDONALD
                                    Assistant U.S. Attorney
                                    600 U.S. Courthouse
                                    300 South Fourth Street
                                    Minneapolis, MN  55415
                                    Attorneys for Appellee

Appellate Case: 07-2173    Page: 53    Date Filed: 12/14/2007 Entry ID: 3383125